*2:23-cr-00066-JAD-DJA - April 24, 2023*

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                        FOR THE DISTRICT OF NEVADA

 3   UNITED STATES OF AMERICA,      )
                                    ) Case No. 2:23-cr-00066-JAD-DJA
 4               Plaintiff,         )
                                    ) Las Vegas, Nevada
 5   vs.                            ) April 24, 2023
                                    ) 3:12 p.m. - 4:07 p.m.
 6   MATTHEW WADE BEASLEY,          ) Courtroom 6D
                                    ) DETENTION HEARING
 7               Defendant.         )
     _____)  C E R T I F I E D   C O P Y

 8

 9               REPORTER'S TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE JENNIFER A. DORSEY
10                UNITED STATES DISTRICT COURT JUDGE

11

12   APPEARANCES:

13   For the Government:    ERIC C. SCHMALE, AUSA
                           DANIEL SCHIESS, AUSA
14                         UNITED STATES ATTORNEY'S OFFICE
                           501 Las Vegas Boulevard South, Suite 1100
15                         Las Vegas, Nevada 89101
                           (702) 388-6336
16

17   (Appearances continued on page 2.)

18

19

20

21   Court Reporter:       Amber M. McClane, RPR, CRR, CCR #914
                           United States District Court
22                         333 Las Vegas Boulevard South, Room 1334
                           Las Vegas, Nevada 89101
23                         (702) 384-0429 or AM@nvd.uscourts.gov

24   Proceedings reported by machine shorthand.  Transcript
     produced by computer-aided transcription.
25
```

1    APPEARANCES CONTINUED:

2    For the Defendant:

3        ***JACQUELINE M. TIRINNANZI, ESQ.***
         *TIRINNANZI LAW PLLC*
4        *2370 Corporate Circle, Suite 190*
         *Henderson, Nevada 89074*
5        *(702) 912-3834*

6    Also Present:

7        *Erin Oliver, Pretrial Services*

8                        * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        LAS VEGAS, NEVADA; MONDAY, APRIL 24, 2023; 3:12 P.M.

2                            --o0o--

3                    P R O C E E D I N G S

4            **COURTROOM ADMINISTRATOR:**  This is the time set for a

5    motion hearing in Case 2:23-cr-66-JAD-DJA, United States of

6    America versus Matthew Wade Beasley.

7            Please make your appearances for the record.

8            **MR. SCHMALE:**  Good afternoon, Your Honor.  Eric

9    Schmale and Dan Schiess appearing for the Government.

10           **MS. TIRINNANZI:**  Good afternoon, Your Honor.

11   Jacqueline Tirinnanzi on behalf of Matthew Beasley.

12           **THE COURT:**  All right.  Good afternoon.

13           We're here on the Government's motion for review of

14   the magistrate judge's order granting pretrial release to the

15   defendant, Mr. Beasley.  The motion for review of that release

16   order is Number 11 in the docket.  The release order was

17   stayed pending my ruling on this motion.

18           I've reviewed the parties' filings, and I listened to

19   the recording of the detention hearing that was conducted on

20   April 7th.  And I promptly scheduled this hearing as required

21   by Title 18 United States Code § 3145.  I will be reviewing

22   the magistrate judge's release order *de novo*.

23           And I'm ready to hear argument, and so I will start

24   with the Government.  Mr. Schmale.

25           **MR. SCHMALE:**  Thank you, Your Honor.

```
 1            Just as a preliminary matter, the Government would
 2   like to request that Docket Entry 11-1, the attachment to our
 3   motion, be sealed.
 4        THE COURT:  It's already -- it was filed unsealed.
 5   Yes?
 6        MR. SCHMALE:  Yeah.  We're requesting temporary
 7   sealing.  Defense counsel approached us before this hearing
 8   and requested that certain information be redacted out of it.
 9   And in order to give us time to do so, we would request that
10   it be temporarily sealed.
11        THE COURT:  I guess my question is, considering that
12   it was filed more than a week ago on the open docket, what
13   good does it do to seal it right now when it's been publicly
14   accessible?  How does -- how does that satisfy the standards
15   for sealing?
16        MR. SCHMALE:  Well, Your Honor, perhaps I would let
17   defense counsel address that since they requested it be
18   sealed?
19        THE COURT:  Thank you.
20        Ms. Tirinnanzi.
21        MS. TIRINNANZI:  Thank you, Your Honor.
22        It was brought to my attention today when the
23   supplements -- the supplemental exhibits, B and C, were filed;
24   that in Exhibit B a certain individual's name with relation to
25   cooperation was redacted, and then in preparation for the
```

1    hearing I noticed that Exhibit A, which was initially filed as

2    an attachment to Docket Entry 11, that name and specifics

3    regarding that name were not redacted.  And so I didn't want

4    to bring more attention to the fact that such sensitive

5    information was out there, and really it came to my attention

6    today when that same name was redacted on other exhibits that

7    were filed supplementally.

8         **THE COURT:**  Is there a single page that's the

9    concern?

10        **MS. TIRINNANZI:**  Yes, Your Honor.  It's pages 15 and

11   16 of the actual transcripts.

12        **THE COURT:**  Transcript page 15 and 16, not docket

13   page Number 15 and 16?  I say that --

14        **MS. TIRINNANZI:**  Yes, Your Honor.

15        **THE COURT:**  -- because these transcript pages are --

16   are -- it's one of those minis, and so it's four per page.

17        **MS. TIRINNANZI:**  That's correct.  So for the mini --

18   the mini pages, pages 15 and 16, which looks like page 16 of

19   40 on the exhibit itself.

20        **THE COURT:**  All right.  So for that reason I -- what

21   I will do is I will allow -- I'll order that the Document 11-1

22   be sealed for now with the request that -- that tomorrow the

23   parties file a redacted version that unseals everything except

24   for page 16.

25        **MS. TIRINNANZI:**  Thank you, Your Honor.

1          **THE COURT:**  All right.  Then, Mr. Schmale, that

2    leaves oral argument for you.

3          **MR. SCHMALE:**  Thank you, Your Honor.  I'll argue it

4    from the podium, if that's permissible?

5          **THE COURT:**  Please.

6          **MR. SCHMALE:**  Thank you, Your Honor.

7          I will be brief, and I want to focus on responding to

8    arguments in the defendant's briefing.  I will not simply

9    recount arguments from our brief unless the Court requests

10   otherwise or requests clarification.

11         **THE COURT:**  How refreshing.

12         **MR. SCHMALE:**  The core argument of the defendant's

13   brief is that the defendant is not a flight risk or a danger

14   to the community because he was being, quote, reasonable when

15   he pulled a gun on FBI agents and engaged in a suicidal

16   four-hour armed standoff.  And specifically on page 11 of the

17   defendant's brief they state, quote, Mr. Beasley's actions on

18   March 3rd, 2022 -- that's the date of the armed standoff --

19   although not typical, are reasonable.  He claims he was being

20   reasonable by pulling a gun on the FBI and engaging in a

21   standoff in which he repeatedly threatened to commit suicide.

22   That is not reasonable and shows he is both a flight risk and

23   a danger, particularly the fact that he's continuing to argue

24   that is reasonable today.

25         He argues it was reasonable to engage in these

1  actions claiming that they were -- they were really caused by

2  the actions of the FBI agents who simply walked up to the door

3  of the house and knocked on it to talk to him.  And the

4  Supreme Court and the Ninth Circuit have both recognized that

5  it's perfectly fine for law enforcement to engage in

6  knock-and-talks where the officer knocks on someone's door and

7  asks questions.  That's plainly shown by the case law, even

8  the ones that the defendant cited.

9         But it was the defendant who answered the door

10  holding a gun to his head and engaged in the standoff.

11         And the defendant's brief also tries to argue it was

12  reasonable that an individual may mistake law enforcement,

13  quote, for an invasion and reasonably take defensive measures

14  to protect himself.  But the defendant here didn't mistake law

15  enforcement for anyone.  He only showed the gun he was holding

16  to his head after an FBI agent showed his badge.  So --

17         **THE COURT:**  And just so I'm clear, because the way

18  that the parties portray this situation is different, was the

19  door open?  Was -- who opened the door?  Do we have those

20  details at this point?

21         **MR. SCHMALE:**  So it's my understanding -- I mean,

22  there's some argument over I think the meaning of the word

23  door here as well.  Because there is an external what was

24  described by the Government as a gate to the house because it

25  is not a door into the inside of the house.  It is an external

1    gate into a courtyard.  I believe the defendant represents

2    that that is actually a door because it is attached to a wall

3    on the outside of the house.  But that -- I believe by all

4    accounts that -- what I will continue to call a gate was

5    unlocked, and the FBI agents simply pushed it open and walked

6    through it and then approached the front door of the house

7    where they knocked on the door into the house.  At that point

8    I don't believe that door ever was opened because the

9    defendant appeared on the other side of it with the gun, and

10   after pointing it in a sweeping motion towards the agents, the

11   agents fired their weapons in self-defense through the glass

12   door striking the defendant.

13        **THE COURT:**  So the agents observed this conduct

14   through the glass in a closed front door?

15        **MR. SCHMALE:**  That's correct.

16        **THE COURT:**  You may continue.  Thank you.

17        **MR. SCHMALE:**  Thank you.

18        So when the FBI agents showed up that day, this was

19   not a surprise to the defendant.  He had been running a nearly

20   half-billion-dollar Ponzi scheme for years, and he knew it

21   would all come crashing down one day, which is why the

22   defendant had previously written a letter to the FBI, which

23   was filed with the Court earlier today and marked as Exhibit

24   B.  The letter was found in an envelope marked FBI, and it was

25   referenced by the defendant in his call with the crisis

1    negotiator.  In that letter the defendant claimed, much as he

2    did in the -- the crisis negotiator transcript, that he was

3    the only one responsible for, quote, this entire mess.  He

4    called himself a liar, a horrible human being.  He said he

5    realized he had gone, quote, too far in to ever recover, and

6    that he was just trying to get his family what he thought they

7    deserved, quote, before it all came to an end.  And he had

8    been warned earlier that day that the FBI was executing search

9    warrants on his associates.

10        So here it was all coming to an end as the defendant

11   himself knew what happened.  And what was his reaction?  Well,

12   when the FBI showed up at his door, he pulled a gun, he had it

13   pointed at his head, he threatened to kill the -- he

14   threatened to kill himself, excuse me, and engaged in a

15   four-hour armed standoff, which the defendant to this day is

16   still claiming was reasonable.

17        A defendant who thinks it is reasonable to pull a gun

18   on FBI agents and engage in a four-hour armed standoff is a

19   danger to the community and a flight risk.

20        And there really is little to suggest that the

21   defendant's mental health is really all that different from

22   that day.  And really this is confirmed by the prison medical

23   records submitted by the defendant with the response brief,

24   and these are -- these are selective prison medical records

25   from what I understand.  We don't know what is in the records

1     that were not submitted.  But just looking at the records that
2     were submitted, we see that in October 2022 the defendant's
3     psychiatrist described him as, quote, a train wreck who is,
4     quote, fine one minute and crying the next and there is no
5     particular thing he is crying about.
6              This is despite the fact that the defendant is on a
7     prescription anti-depressant, and in another psychiatrist
8     report he -- the defendant reported, quote, feeling depressed,
9     experiencing mood swings, and explaining "I'm fine" and then
10    in tears.  And this -- this is on ECF 16-3, pages 7 and 8.
11             He also reported that he was -- had been, quote,
12    getting angry with his ex-wife and said that he will, quote,
13    explode at her at moments.
14             In November 2022, another mental health professional
15    noted that the defendant was, quote, tearful while discussing
16    family stressors and emotional about his, quote, ex-wife
17    telling him to stop communicating with her.
18             Now, in the psychologist's reports, this is
19    attributed to I believe unresolved stressors which would
20    presumably include his indictment for running this nearly
21    half-billion-dollar Ponzi scheme.  And the sentencing
22    guidelines suggest that these stressors would only be resolved
23    with the defendant serving a lifetime prison sentence.
24             And this is a man who has already pulled a gun on FBI
25    agents and threatened suicide in an armed standoff, and here

1   we are one year later and he's arguing not only is that

2   reasonable but he's also submitting psychiatrist reports

3   calling him a train wreck who is fine one minute and crying

4   the next and who will explode with anger towards his ex-wife.

5   So this mental health evidence confirms that the defendant is

6   both a flight risk and a danger to the community.

7         To try to show that he is not a flight risk, the

8   defendant submitted a declaration from Geoff Winkler who is

9   the receiver responsible for recovering assets for the victims

10  in the Ponzi scheme.  Mr. Winkler is present in court today,

11  along with his counsel, Kyle Ewing.

12        So to ensure the Court is dealing with complete

13  information, the Government obtained a supplemental

14  declaration from Mr. Winkler which was filed with the Court

15  this morning and marked as Exhibit C., and that -- that

16  declaration clarifies a few points relevant to the detention

17  hearing.

18        **THE COURT:**  For the record, it's Document

19  Number 21 --

20        **MR. SCHMALE:**  Thank you, Your Honor.

21        **THE COURT:**  -- dash 2.

22        **MR. SCHMALE:**  In that declaration, Mr. Winkler's

23  clear that there's no advantage to his work if the defendant

24  is released and that the defendant has been able to provide

25  adequate assistance while incarcerated.  Mr. Winkler also has

1    concerns that victim funds are being used for the defendant's

2    benefit even while he's in prison.  Specifically, victim funds

3    have been used to pay for Mr. Beasley's retained psychological

4    expert that was submitted in an earlier effort for him to --

5    to secure his release in June of 2022, and that report was

6    also attached here to defendant's response as Exhibit 2.

7            And separately, in the SEC case -- this is not in the

8    declaration, but this appears on the SEC docket -- the

9    defendant's ex-wife admitted to selling a Ferrari for over

10   $55,000 and that half of that went to the defendant's then

11   defense attorney for his legal representation.

12           So this dissipation of victim assets that were seen

13   even while the defendant is in custody would presumably only

14   be a bigger threat if the defendant were released.

15           Similarly, the defendant told Mr. Winkler that he had

16   approximately $500,000 in cash at his home on the date of the

17   armed standoff with the FBI.  The FBI was only able to recover

18   a little over $200,000 in cash.  So where is that potentially

19   missing $300,000?

20           Well, on the morning of March 3rd, after -- while the

21   search warrants were being executed on the defendant's

22   associates but before the FBI or agents had arrived at the

23   defendant's home, the defendant's adult son was seen by the

24   FBI at the defendant's home loading two bags into the trunk of

25   an Aston Martin vehicle and leaving the home.  It's possible

1    that the $300,000 was in those bags.  But even that $300,000

2    is small compared to the $7- to $10 million that Mr. Winkler

3    estimates the defendant personally obtained from the Ponzi

4    scheme that is unaccounted for.

5            So this raises serious questions that, if Mr. Beasley

6    were released from prison, he would have access to $7- to

7    $10 million of victim money, which could be used either to

8    flee from prosecution or could simply be used to dissipate the

9    money and prevent its recovery for investors.

10           So in sum, to sum this up, the defendant still

11   believes here a year later that it was, quote, reasonable to

12   engage in a suicidal armed standoff with the FBI.  His mental

13   health is described as a train wreck, and if he's released, he

14   may have access to $7- to $10 million in unaccounted for

15   victim money.  For these reasons, and as well as the reasons

16   in the Government's original brief, he remains both a flight

17   risk and a danger to the community and the Government requests

18   he be detained.

19           **THE COURT:**  How do you respond to the argument which

20   I think is the suggestion in defense counsel's brief that the

21   circumstances of the FBI standoff and FBI visit to -- to the

22   home suggests an illegality that might impact the strength of

23   the Government's case when I take that into consideration as I

24   must under the statutory factors?

25           **MR. SCHMALE:**  Yes.

1    **THE COURT:**  And not to prejudge -- I want to make it

2    clear, in no way will I be prejudging any potential

3    suppression motion.  I'm only addressing this with respect to

4    the factors.

5    **MR. SCHMALE:**  Yes.  Thank you, Your Honor.

6    First, there's -- you know, our brief points to

7    the -- there's a lot of -- there's overwhelming other evidence

8    that the defendant committed this crime.  So the Government is

9    not relying on the confession to prove this crime, and it

10   could be proved without that confession.

11   Second of all, this is not the only time that the

12   defendant has confessed.  We see it in not only the crisis

13   negotiator transcript, we see it in the letter that was

14   recovered.  The defendant made statements to the Washington

15   Post, and the defendant has made other statements to law

16   enforcement.  We focused on the -- the transcript here that we

17   provided because that is -- it's in transcript form, and I

18   believe it was publicly available even before this, and it's

19   all very clear and very detailed there.

20   I mean, in defendant's briefing, even as they argue

21   it, don't -- does not argue that it should be addressed as

22   relevant to the factors here.  It appears in a section of the

23   brief titled "Other Considerations."  What's relevant here

24   today is what the defendant did.  It's what the defendant did

25   that day that shows he is a flight risk, that shows he is a

1    danger to the community completely apart from the -- the

2    contents of the confession as they go to the merits of the

3    case.

4            THE COURT:  Thank you, Mr. Schmale.  I'll bring you

5    back up for rebuttal after I hear from defense counsel.

6            MR. SCHMALE:  Thank you, Your Honor.  I appreciate

7    it.

8            MS. TIRINNANZI:  Your Honor, may I argue from here?

9            THE COURT:  You may.

10            MS. TIRINNANZI:  I've made a bit of a mess, once

11    again.  Thank you.

12            Your Honor, we are going to respectfully request

13    release with conditions which is in agreement with Pretrial

14    Services and, of course, the magistrate's decision despite

15    this being a *de novo* hearing.

16            The law requires you consider the 3142(g) factors in

17    determining whether there are conditions of release that will

18    reasonably assure my client's appearance and safety of any

19    person and community, which the law also requires the least

20    restrictive conditions for that release.

21            I have a wealth of evidence that relates directly to

22    the 3142(g) factors that prove that release conditions are --

23    they would provide a reasonable assurance, which is all that's

24    required under the law.

25            And so really today the Government is not carrying

1    its burden of proving by clear and convincing evidence that no

2    conditions will reasonably assure appearance and safety.

3           I'd like to move -- I know that this was touched on

4    in the briefing, so I'll just be quick unless you have

5    questions.  But I do want to address them.

6           **THE COURT:**  Please.

7           **MS. TIRINNANZI:**  As far as the history and

8    characteristics of Mr. Beasley, he has been in Las Vegas since

9    2004.  He has strong ties to the community.  The only other

10   place he lived before this was the Midwest, like Kansas and

11   Missouri area, where he grew up and went to school.  He has

12   family here.  His parents are here.  They're actually in court

13   here today, Violet and Wayne.  And they have offered a stable

14   home for him to live in.  He's also needed in that home

15   because Violet is a breast cancer survivor, and that condition

16   has made her more frail.  And on top of that, she has

17   degenerative disk disease and can basically only stand for

18   about 30 seconds at a time.  So Mr. Beasley's help is greatly

19   needed in the home because Wayne still works in the capacity

20   as an engineer by day.  And so any help that he can aid in

21   that home is needed.  And, again, that reinforces -- you know,

22   it gives Mr. Beasley stability and support.

23          In addition, he has other family here.  His sons, he

24   has minor sons here, and he still has joint legal custody over

25   them.  He wishes to continue a relationship with them.  Last

 1    week his oldest son actually gave birth to his first -- well,

 2    his partner gave birth to their first child.  So Mr. Beasley

 3    is now a grandfather as of last Wednesday, and that has had a

 4    tremendous impact on his life outlook.

 5         And in addition, he has never owned a passport.  He

 6    has never left the country.  He has no desire for

 7    international travel.

 8         He has no financial resources.  There was an asset

 9    freeze, and although the Government submitted a declaration

10    from the receiver in the SEC action, we also obtained a

11    declaration previously that explained there was a preliminary

12    injunction and asset freeze in the SEC case and that he has

13    continued to cooperate with the receiver to -- in his efforts,

14    and then also with obtaining assets related to potential

15    third-party recovery assets.

16         And as I mentioned in my response, there are between

17    20 and 30 other SEC defendants in the SEC case.  Mr. Beasley

18    is the only individual indicted in the criminal case, but

19    there are many, many other parties that were involved in the

20    alleged scheme.  So to attribute, you know, any -- any

21    finances or assets that are missing, to put all of that onto

22    Mr. Beasley is not exactly accurate and also a better -- it's

23    a better issue for a finder of fact and for us to address when

24    we move with -- forward with the case.  At this time we don't

25    have any discovery either.

 1          But the fact that we have a declaration that
 2   Mr. Beasley has been cooperating thus far shows his intentions
 3   to assist and that he is not -- he does not have access to
 4   funds to -- to flee or -- I mean, whatever the concern is.
 5          Additionally, Mr. Beasley has no history of drug or
 6   alcohol abuse.  And as far as the suicide issue is concerned,
 7   we don't believe that that is a relevant factor when assessing
 8   serious risk of flight or serious risk that he will obstruct
 9   justice, threaten, injure, intimidate prospective witnesses or
10   jurors.  That does not meet the standard.  That is not
11   relevant.
12          Now, I -- without conceding that we don't believe
13   it's relevant, we have information that supports he is not
14   suicidal.  We have the attached evaluation from the
15   psychologist.  We have repeated conclusory findings from
16   Nevada Southern Detention Center saying that he is not
17   suicidal, he is not at risk.  There have been no incidents
18   while he was there.  And we do attach in those records that
19   the Government mentioned a few comments about Mr. Beasley
20   being upset.  There is also notes that he has PTSD from when
21   he was shot by the FBI in his own home.  So he's been detained
22   there for the past 14 months on a charge that was ultimately
23   dropped as well.  So that is cause for some distress.
24          Going back just to the 3142(g) factors, he has no
25   criminal history.  This is not a presumption case.  There

2:23-cr-00066-JAD-DJA - April 24, 2023

```
 1    is -- we have -- the Government is relying on statements that
 2    were made to an FBI negotiator during an alleged four-hour
 3    standoff.  Again, that case was dismissed.  And we have only
 4    seen -- we never had an opportunity to assess the evidence in
 5    that case.  We've just seen various cherry-picked excerpts,
 6    but we did not see anything along the lines of a call to 911
 7    which happened multiple times before those calls were rerouted
 8    to a crisis -- FBI crisis negotiator who has all the control
 9    in that scenario anyways as Mr. Beasley is laying on the floor
10    of his own home bleeding out and he had attempted to ask for
11    help.  So statements that are made in -- in that context,
12    I'm -- we never said -- you know, we're not -- to clarify,
13    we're not alleging that Mr. Beasley was reasonable in -- when
14    he pointed a gun at the FBI because we don't believe that.  We
15    dispute the entire facts of that day.
16            In our response I do show the front door which has --
17    it locks.  It's not a half gate as the Government continues to
18    refer to it.  It's a full door.  It has a doorbell.  And by
19    the Government's own admission, in the complaint for the
20    assault on the -- for the assault on the federal officer
21    charges -- which, again, were dropped -- they state that the
22    FBI rang the Ring and then pushed their way through and
23    continued into his home.  And we also dispute what happened
24    there.  But at the same time, we haven't had the opportunity
25    to fully analyze what happened other than the fact that the
```

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

1 case was dismissed before we had the opportunity to move

2 forward with the preliminary hearing.

3   As far as -- going back to the issue of suicide, I

4 would just like to, again, emphasize the fact that those --

5 those are trained, licensed mental health professionals, a

6 psychologist and a psychiatrist, making these judgments as

7 opposed to, you know, nonmedical professionals.  We're all

8 just attorneys here.  So I don't -- those -- anything that the

9 Government is offering to show that Mr. Beasley is suicidal is

10 not factual and it's not supported in anything scientific.

11   Additionally, as to the declaration from the receiver

12 that was submitted today, none of the Government's -- nothing

13 in what the Government sets forth in that declaration states

14 that Mr. Beasley has not been cooperative.  Mr. Beasley was

15 the individual who informed the receiver that there had been

16 $500,000 in cash at his home, which the receiver states only

17 around 200-something was recovered, nearly $300,000 is

18 unaccounted for.  Well, Mr. Beasley hasn't been back to his

19 home since the day that he was shot in his home.  So he was

20 forthcoming with the fact that that money was most likely

21 there.  So nothing in that declaration really shows that

22 Mr. Beasley has been anything but cooperative.  And also, keep

23 in mind that, under the SEC action, there are over -- you

24 know, dozens of other parties that are named defendants in

25 that case.

1          Again, also that declaration points out issues that

2     have to do with Mr. Beasley's ex-wife who is represented by

3     her own counsel.  The decisions that they are making, we --

4     we're not -- we're not privy to that.  I don't -- we don't

5     know what is going on, and that should not be a basis to

6     continue to detain Mr. Beasley, especially when we have a

7     declaration stating otherwise on the same issue.

8          Also, I would like to add that there's a statement

9     that there are numerous investors concerned, you know, that

10    Mr. Beasley may present a danger.  We don't know who these

11    individuals are.  That's a conclusory statement.  There's

12    nothing factual there.  The Government's not putting on

13    witnesses.  We don't know who they are, what bias they may

14    have.  Again, there are dozens of other parties named in the

15    SEC action that benefit, really, to state that of course

16    Mr. Beasley is a problem.  But we don't know how or who's

17    saying this or anything like that.  There's no basis for us to

18    go by.  Mind you, a neutral third party, Pretrial Services, is

19    stating that Mr. Beasley is not a danger and they don't have

20    concerns and that there are conditions that can accommodate

21    him.

22          Finally, I would also like to address the other

23    supplement -- the other supplemental exhibit that the

24    Government set forth today, Mr. Beasley's note to the FBI.

25    I'm assuming that is meant to go towards the weight of the

2:23-cr-00066-JAD-DJA - April 24, 2023

```
 1    evidence which is the least important factor to be considered
 2    for release.  But as far as Mr. Beasley's note to the FBI,
 3    we're aware of existence -- the existence of evidence to the
 4    contrary that is material to the statements being set forth in
 5    that note.  So really that note is taken out of context.  We
 6    haven't had the ability to look at any other evidence, and
 7    it's really more suitable for a finder of fact, not for a
 8    detention hearing to determine if Mr. Beasley is a serious
 9    risk of flight or a serious risk of obstructing justice or
10    threatening, injuring, intimidating prospective witnesses or
11    jurors.
12             Oh.  And then also, Your Honor, there were statements
13    that were made with regard to funds being used, but we -- we
14    disagree.  Certain allegations that the Government has made as
15    to the funding of the psych report or the funding of previous
16    counsel, who is not myself, those were -- we set forth that
17    those were put on an American Express card and that those were
18    not paid out of illicit funds.  So we didn't have any -- I
19    mean, the declaration was signed on April 19th.  It was filed
20    this morning.  So we didn't have the opportunity to further
21    pursue those statements that were being made, but we disagree
22    with them completely.
23             And also I would like to add that the potential
24    penalty in this case is not a legitimate basis for finding a
25    serious risk of flight.
```

1          **THE COURT:**  Is it not a consideration?

2          **MS. TIRINNANZI:**  It's a consideration, but it's not

3     the legitimate basis for that.  And in cases concerning risk

4     of flight, we've required more.  *Freedman* (phonetic) states

5     that we've -- in cases concerning risk of flight, we have

6     required more than evidence of the commission of a serious

7     crime and the fact of a potentially long sentence to support

8     finding risk of flight.

9          Serious economic crime that generated great sums of

10    ill-gotten gains, evidence of strong foreign family or

11    business ties is necessary to detain a defendant.  That's *U.S.*

12    *versus Giordano*.  The Government has not presented any

13    evidence that the client intends to flee or has anywhere to

14    flee to.  Going back to just the discussion of funds, that --

15    all of which that discussion is more suitable for a finder of

16    fact and once we actually have access to the discovery and --

17    which we believe and are aware of evidence that puts that into

18    context and disputes some of those statements as well.

19          And again, Your Honor, I'm not sure if I mentioned

20    it, but Mr. Beasley is -- is a nonviolent offender, and he has

21    no criminal history.  And -- oh.  Also, one more factor, he --

22    and this was also verified by Pretrial Services.  He has a job

23    offer with a construction company.  He actually has multiple

24    job offers, but that was the best offer.  It's in a -- in an

25    office capacity, but it's been verified by Pretrial Services.

2:23-cr-00066-JAD-DJA - April 24, 2023

1    That job includes the potential for receiving benefits,
2    including medical after 90 days, which Mr. Beasley needs due
3    to the fact that he still has bullets lodged inside of him
4    from when the FBI shot him.  And so that is just one more
5    factor supporting his history and characteristics that release
6    is appropriate.
7              **THE COURT:**  Thank you, Counsel.
8              **MS. TIRINNANZI:**  Thank you.
9              **THE COURT:**  Rebuttal.
10             **MR. SCHMALE:**  Thank you, Your Honor.
11             I will be brief.  First, on the point of missing
12   financial assets, defense counsel suggested that that $7- to
13   $10 million could be with any number of other individuals
14   associated with the scheme.  But that $7- to $10 million we
15   understand from Mr. Winkler is limited to amounts that were
16   put into Mr. Beasley's IOLTA account and then, thereafter,
17   have been unaccounted for.  This is paragraph 5 of his
18   declaration where he says:  As receiver, I currently estimate
19   that $7 million to $10 million received by Mr. Beasley in his
20   IOLTA account as part of the alleged Ponzi scheme are
21   currently unaccounted for.  So those are simply funds linked
22   directly to Mr. Beasley.  I'm sure there are -- there's much
23   more than that that is unaccounted for when you're looking at
24   the -- the entire scheme as a whole.
25             Defense counsel has repeatedly claimed that the

```
 1    defendant was asking for medical attention.  That's
 2    contradicted by the transcript.  It's in our brief.  I don't
 3    want to dwell too much on it but, I mean, some quotes here.
 4    Quote, I do not want any medical attention.  Quote, I'm not
 5    coming out.  I'm not coming out.  When I come out, I'll be
 6    dead.  When asked why we didn't want medical attention, he
 7    responded:  Because I'm not -- I'm not coming out, first off.
 8    I'm going -- and I'm not going to jail.  I don't want medical.
 9    I want to die.
10          So gives you a flavor.
11          On the suppression point, I know Your Honor
12    rightfully doesn't want to get into a potential suppression
13    motion at this stage, but I do just want to flag there are any
14    number of cases holding that pushing through an unlocked gate
15    and approaching the front door to a home is perfectly
16    reasonable and falls under the knock-and-talk exception.  So I
17    don't in any way want to concede that point, and particularly
18    since the case defense primarily relies on this *Hardan v. Nye*
19    *County*.  I note Your Honor -- this case was cited to
20    Your Honor in a previous instance, and Your Honor's response
21    was to reject it and say, quote, a decision by one judge in
22    this district is not binding on any other district judge and
23    does not constitute the rule of the law from this district.
24          **THE COURT:**  That's actually just one of our local
25    rules.
```

```
 1              MR. SCHMALE:  Yeah, you restated the local rule in
 2    your --
 3              THE COURT:  Right.
 4              MR. SCHMALE:  Yes.  That's right.  Anyway, that
 5    was -- it was on a slightly different point.  But, you know, I
 6    believe that case is distinguishable for a number of reasons,
 7    too.  It was a civil case context.  It wasn't criminal.  And
 8    there law enforcement allegedly broke a lock on the gate
 9    and/or jumped a fence.  And here there's -- there's no sort of
10    dispute like that.
11              Defense counsel says that he's -- claims that he's
12    not suicidal, the defendant is not suicidal, and that there
13    isn't, quote, anything scientific suggesting he's suicidal.  I
14    mean, I don't think we need anything scientific here.  We have
15    repeated statements by the defendant himself that he is
16    suicidal.  I don't think a retained expert just simply saying
17    something to the contrary is terribly helpful --
18              THE COURT:  And I think really their position is he's
19    no longer suicidal.
20              MR. SCHMALE:  Yes.  Okay.  I'll accept that.  But I
21    think that is undermined by the medical records that show
22    there's a lot of volatility in his mental state.  And for
23    purposes of whether he is suicidal at the moment is a very
24    different question from would he be suicidal if he were
25    released and then were called upon to self-surrender to serve
```

1    a life sentence in prison.

2           And, Your Honor, I'm prepared to touch on the

3    pretrial report and/or Judge Ferenbach's discussion and ruling

4    to the extent that they're helpful to you --

5           **THE COURT:**  It would be helpful for you to touch upon

6    the Pretrial Services report.

7           **MR. SCHMALE:**  Sure.  Pretrial Services --

8           **THE COURT:**  The updated one.

9           **MR. SCHMALE:**  Yes.  That's right, Your Honor.

10          We don't think it is of much value here because it is

11   very limited in what information it considers.  It does not

12   consider the circumstances of the offense in question.  So our

13   understanding, based on discussions with Pretrial, is their

14   marching orders are to look at the offense -- and in this case

15   it's wire fraud -- and they don't look at the size of the

16   fraud, they don't look at the surrounding circumstances, they

17   don't look at the -- the full confession, the life in prison,

18   the armed standoff.  And Judge Ferenbach, in his discussion,

19   acknowledged these limitations and noted that, you know, it's

20   the job of the Court to consider the nature and circumstances

21   of the offense and the weight of the evidence.  And he -- I

22   believe he explicitly said, quote, they're not telling, you

23   know, me how to do my job.  They're not telling the judge how

24   to do their judge.  So they're very cabined in what they look

25   at.  And I think under our -- the facts of our case, it's

1  not -- what they're allowed to look at is not terribly helpful

2  given that it doesn't look at the core issues that go to him

3  being a flight risk and a danger to the community, which is

4  the size of the -- the fraud here, the sentencing guidelines

5  range he's looking at, and the circumstances of the offense

6  that include this armed standoff with law enforcement.

7          And I would also add that the -- Pretrial Services,

8  they did not have access to these additional mental health

9  documentation that defense counsel provided in their response

10  where the mental health providers described the defendant as,

11  you know, quote, a train wreck, and that he was prone to

12  explode with anger.  So I think those are relevant

13  considerations that weren't even in front of Pretrial when

14  they were looking at this in their report.

15          Unless Your Honor would like me to address more about

16  Judge Ferenbach's order, then I think --

17          **THE COURT:**  I mean, you're here.  Go ahead.

18          **MR. SCHMALE:**  Okay.  Thank you.  I just want to be

19  clear that there have been two magistrate judges who have

20  looked at this case.

21          **THE COURT:**  That's right.  Judge Youchah --

22          **MR. SCHMALE:**  That's right.

23          **THE COURT:**  -- and Judge Ferenbach.

24          **MR. SCHMALE:**  That's right.

25          And so Judge Youchah ordered that the defendant be

1   detained, and Judge Ferenbach has ordered the defendant is to

2   be released.  And it's our position that not a whole lot has

3   changed in the meantime and that, in effect, the Court here is

4   being asked to resolve a conflict between these two judges.

5         **THE COURT:**  Right.  What changed really was the

6   dismissal of the other charge, the assault on a federal

7   officer charge.

8         **MR. SCHMALE:**  Yes.

9         **THE COURT:**  Yes.

10        **MR. SCHMALE:**  That did change.  Now, what also

11   changed was the Ponzi scheme charge was brought.  That charge

12   was not sitting around on the -- the time -- where the initial

13   charges were filed.  The underlying conduct from the assault

14   on a federal officer charge, that's still there.  But you're

15   right, the charges are not -- are not there.  So that may have

16   also influenced the Pretrial Services report.  But in terms of

17   the charges, they've only gotten more serious.  They've gone

18   from charges that have a guideline range of -- I believe it's

19   in our brief of -- the assault on a federal officer was 40, 50

20   months, something like that.  And now we're looking at a

21   guidelines range that is life in prison.  So the offense has

22   only gotten far more serious in the intervening time.

23        I mean, Judge Youchah, you know, described the

24   defendant's conduct as frightening and of grave concern and

25   desperate acts, including bringing a gun to a front door where

1    law enforcement was there.  Judge Youchah noted there's no way

2    to stop guns from reappearing, whether through associates or

3    family or friends.  And given the repeated statements

4    regarding willingness to take one's own life and the

5    indication that he's willing to shoot law enforcement cannot

6    be ameliorated.  Judge Youchah further noted the defendant

7    knew it was law enforcement who came to his residence, came to

8    the door with a loaded gun, pointed the gun at his own head,

9    and waived the gun towards that law enforcement, and

10   barricaded in his home for four hours and had to be removed by

11   FBI SWAT.  And the Court also found that defendant had

12   substantial financial resources at his disposable and faces a

13   lengthy jail sentence.

14        Judge Ferenbach's order was also based on what we

15   believe to be some statements of defense counsel that are

16   contradicted by the evidence.  At the prior hearing defense

17   counsel suggested that the receiver's declaration showed that,

18   quote, there are no funds for Mr. Beasley to flee on.  I mean,

19   as an initial matter, that's not in the initial declaration.

20   But to the extent that there was any ambiguity, the

21   supplemental declaration clarifies that there's $7- to

22   $10 million of unaccounted for money that the defendant could

23   use to flee.

24        Second, Judge Ferenbach was told by defense counsel,

25   quote, being detained has inhibited the defendant's ability to

1    cooperate with the receiver.  Again, the supplemental

2    declaration clarifies that, that this is not the case and he

3    has been fully able to cooperate.

4            And then Judge Ferenbach also did not have access to

5    the supplemental mental health records provided by defense

6    counsel in which he is described as a train wreck and which

7    is -- and he's depressed and his anger issues are apparent

8    where he will explode with anger at least towards his ex-wife.

9            A couple other points that -- Judge Ferenbach didn't

10   seem to appropriately consider the relevance of the suicide

11   risk.  He noted that the statute -- quote, the statute doesn't

12   talk about danger to himself, suggesting that he did not

13   consider suicide risk to kind of fit within the legal

14   analysis.  But I believe our briefing shows that there's ample

15   case law showing that the suicide risk at a minimum goes to

16   risk to nonappearance, and also there's additional case law

17   showing that, if a defendant is a potential danger to

18   themselves, then they can also be judged a danger to those

19   around him.  So I don't believe Judge Ferenbach was -- was

20   considering that.

21           And just one final point.  Judge Ferenbach suggested

22   that the defendant, quote, is in a frame of mind that's

23   different from when he lost it.  But, again, we think that the

24   psychological evidence that has come out since then, which

25   I've repeated a few times already, that again belies that

1    conclusion.  That is additional evidence that Judge Ferenbach

2    did not have to consider at that time.

3              **THE COURT:**  Thank you, Mr. Schmale.

4              **MR. SCHMALE:**  Thank you.

5              **THE COURT:**  All right.  I want to thank both of you

6    for your fine briefing and your compelling presentations.  I

7    also want to thank everybody who has come to the courthouse

8    today for this important hearing.

9              I've considered the factors under Title 18 United

10   States Code § 3142, which include the nature and circumstances

11   of the offense charged, the weight of the evidence against the

12   defendant, the history and characteristics of the defendant,

13   including his character, physical and mental condition, family

14   ties, employment, financial resources, length of residence in

15   the community, community ties, past conduct, history relating

16   to drug or alcohol abuse, criminal history, and record

17   concerning appearance at court proceedings and, secondly,

18   whether at the time of the current offense or arrest he was on

19   probation, parole, or other release pending trial, sentencing,

20   appeal, or completion of a sentence for an offense -- he was

21   not -- and the nature and seriousness of the danger to any

22   person or the community that would be posed by the defendant's

23   release.

24              When considering the record in light of these

25   factors, this is a difficult decision and a close call which I

1    think is evidenced by the fact that we have two different

2    magistrate judges who looked at this situation and concluded

3    opposite.

4             Mr. Beasley has had a long professional career as an

5    attorney in this community.  He has strong family ties here.

6    His ex-wife, children, and mother and stepfather all reside

7    here.  If released, he could live with his mother.  And

8    because his law license has been suspended, he can't work as a

9    lawyer, but he could secure alternate employment and has

10   options available to him for employment.  Were he to be

11   released, he could be of great help to his mother.  And he

12   doesn't have a passport.  That's what the record shows with

13   respect to those nature-and-characteristic factors.

14            Other than one very notable incident, he doesn't have

15   a history of violence or any criminal history to speak of.

16   But it's this notable incident that so heavily weighs down the

17   other side of that release scale, of course.

18            The defendant is under indictment for a total of

19   eight counts of wire fraud and money laundering arising out of

20   an alleged $50 million -- I'm sorry, $500 million Ponzi scheme

21   with more than a thousand victims.  That comes from the

22   indictment.  Thus, the nature and the circumstances of the

23   offense are grave, and they put the defendant in a position of

24   shame and ridicule in the eyes of his community and his peers.

25   An admitted gambling problem complicated or perhaps

1   contributed to this situation.  And when this alleged scheme

2   came to light a little over a year ago, the result was an

3   armed standoff between the defendant and FBI agents which

4   resulted in the defendant being twice shot while he held a gun

5   with law enforcement at his door and then staying in his home

6   for several hours bleeding while on the phone with a

7   negotiator.  As he held the gun, repeatedly stated that he was

8   going to take his own life, and confessed to details of this

9   alleged scheme before ultimately being removed from his home

10  by the SWAT team.

11          The transcript of the negotiations with the FBI at

12  Document 11-1 reflect that he was suicidal.  I don't think

13  anyone disputes -- can reasonably dispute that at that time.

14  He had written letters to his family apologizing for his

15  actions, and he indicated he was planning to shoot himself.

16  He repeatedly stated that he would not allow himself to go to

17  jail, and he believed he would face life in jail and the

18  ridicule of his community.  He expressed regret that the FBI

19  didn't manage to kill him, and the language they used as found

20  in that transcript can be fairly interpreted only one way:

21  The defendant was suicidal and had made the decision to die

22  instead of facing prison time.

23          And the evidence, particularly including the

24  statements that day, appear to weigh strongly and heavily

25  against him.  I recognize that's one of the smaller factors in

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

1   this analysis, but it's one that weighs strongly and heavily

2   against him.

3           Now, of course that was a year ago, and the

4   information and mental health opinions that the defense has

5   provided suggest that the defendant has maybe had a

6   cooling-off period and is no longer suicidal and has a more

7   positive outlook on life, particularly now that he's become a

8   new grandfather.  And additionally, the FBI has confiscated

9   his firearm.

10          Although I recognize that those events on that

11  terrible day in March of last year were likely an aberration

12  in Mr. Beasley's life, the circumstances that led to those

13  events and his claimed desire to take his life at that time,

14  those continue to this day and they remain significant

15  stressors for Mr. Beasley.

16          So ultimately, when applying these facts to the

17  factors, I find by a preponderance of the evidence that no

18  condition or combination of conditions will reasonably assure

19  the appearance of the defendant as required.  He's facing a

20  lengthy jail sentence for these crimes which carry a maximum

21  sentence of, as the Government tells us, 160 years in prison

22  and potentially life in prison -- imprisonment as he

23  recognizes and he certainly expressed to the FBI negotiator.

24  The circumstances of an armed confrontation with law

25  enforcement and a multi-hour armed standoff show by at least a

```
 1   preponderance that the defendant is a risk of nonappearance
 2   because, as courts have recognized and as Government counsel
 3   indicated, taking one's own life will assure nonappearance.
 4   And these circumstances show a desire to evade accountability
 5   for these crimes.
 6          The defendant's repeated statements to the negotiator
 7   that he had no intention of going to jail for these crimes
 8   further supports an inclination to take steps to avoid
 9   accountability.  The strength of the evidence against him only
10   would provide further reason to flee if released.  And
11   finally, it appears from the declaration of the receiver,
12   Receiver Winkler, that there may be hundreds of thousands of
13   dollars in cash or far more that is unaccounted for and this
14   could be used as a resource for flight.
15          I also find by clear and convincing evidence that no
16   condition or set of conditions that I can impose will
17   reasonably ensure the safety of others and the community.
18   These circumstances of an armed confrontation with law
19   enforcement and a multi-hour armed standoff also show by clear
20   and convincing evidence that the defendant is a danger to the
21   community because the involvement of guns in this way risk not
22   only his own life but the safety of law enforcement officers
23   and any anyone in the vicinity.
24          He indicated during that event that he lamented that
25   law enforcers merely shot and didn't kill him, and even if he
```

1    doesn't shoot during the incident, his actions caused law

2    enforcement to open fire creating a danger to everyone

3    involved and anyone nearby.

4         I recognize that the Government dropped the assault

5    on a federal officer case, but I don't find that that changes

6    the calculus when the Ponzi scheme indictment came in the

7    meantime.

8         I acknowledge that the defense paints this situation

9    as one created entirely by the FBI agents' unannounced,

10   unlawful, and forceful intrusion into the defendant's home

11   without a warrant and that the defendant had no intention of

12   harming anyone.  I make no statement and don't prejudge

13   anything that might come before me on a suppression motion,

14   but what I will say with respect to that is that the

15   defendant's statements to the negotiator belie that

16   characterization for my purposes today.  And it's clear from

17   those statements that he intended to harm himself, and he had

18   a firearm creating a danger not just for himself but for law

19   enforcement and the community.

20        And although the defense suggests that Mr. Beasley is

21   in a better mental state now -- and I certainly think that

22   that's partially true but -- as evidenced by the mental health

23   opinions that they've provided.  But even the defense's mental

24   health evidence also shows some volatility in his mental

25   state.  And the weight of the reality here is that the

1    defendant's situation has only gotten heavier.  He's since

2    lost his wife.  He's had his law license suspended and assets

3    frozen, and he's the subject of an SEC civil action pending in

4    this courthouse as well.

5              So in light of all of those considerations and those

6    factors, I grant the motion for review of the magistrate

7    judge's release order, and I order that the defendant be

8    detained pending trial and that the release order issued by

9    the magistrate judge is vacated.

10             Any questions or anything else I need to address?

11             **MR. SCHMALE:**  Nothing from the Government.  Thank

12   you, Your Honor.

13             **MS. TIRINNANZI:**  No.  Thank you, Your Honor.

14             **THE COURT:**  All right.  Thank you, everyone.  We're

15   adjourned.

16        *(Proceedings adjourned at 4:07 p.m.)*

17                          --o0o--

18                 COURT REPORTER'S CERTIFICATE

19        I, AMBER M. McCLANE, Official Court Reporter, United
     States District Court, District of Nevada, Las Vegas, Nevada,
20   do hereby certify that pursuant to 28 U.S.C. § 753 the
     foregoing is a true, complete, and correct transcript of the
21   proceedings had in connection with the above-entitled matter.

22   DATED:  4/30/2023

23

24   /s/ *Amber M. McClane*
                          _____
25                    AMBER McCLANE, RPR, CRR, CCR #914