*TRANSCRIBED FROM DIGITAL RECORDING*
*2:23-cr-00066-JAD-DJA • 4/7/2023*

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF NEVADA

 3   UNITED STATES OF AMERICA,    )
                                  ) Case No. 2:23-cr-00066-JAD-DJA
 4             Plaintiff,         )
                                  ) Las Vegas, Nevada
 5   vs.                          ) April 7, 2023
                                  ) Courtroom 3D
 6   MATTHEW WADE BEASLEY,        )
                                  )
 7                                ) Recording method:
               Defendant.         ) Liberty/CRD
 8   _____ ) 2:59 p.m. - 3:48 p.m.
                                    4:21 p.m. - 4:24 p.m.
 9                                  DETENTION HEARING

10                       C E R T I F I E D   C O P Y

11                    TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE CAM FERENBACH
12          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

13

14   APPEARANCES:

15   For the Government:    DANIEL SCHIESS, AUSA
                            ERIC C. SCHMALE, AUSA
16                          UNITED STATES ATTORNEY'S OFFICE
                            501 Las Vegas Boulevard South, Suite 1100
17                          Las Vegas, Nevada 89101
                            (702) 388-6336
18

19   (Appearances continued on page 2.)

20   Recorded by:          Tawnee Renfro

21   Transcribed by:       Amber M. McClane, RPR, CRR, CCR #914
                           United States District Court
22                         333 Las Vegas Boulevard South, Room 1334
                           Las Vegas, Nevada 89101
23                         (702) 384-0429 or AM@nvd.uscourts.gov

24   Proceedings recorded by electronic sound recording.
     Transcript produced by mechanical stenography and computer.
25
```

```
 1    APPEARANCES CONTINUED:

 2    For the Defendant:

 3        JACQUELINE M. TIRINNANZI, ESQ.
          TIRINNANZI LAW PLLC
 4        2370 Corporate Circle, Suite 190
          Henderson, Nevada 89074
 5        (702) 912-3834

 6    Also Present:

 7        Emily McKillip, Pretrial Services

 8        Vanessa Montes, Pretrial Services

 9

10                        * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

TRANSCRIBED FROM DIGITAL RECORDING
2:23-cr-00066-JAD-DJA • 4/7/2023

1          LAS VEGAS, NEVADA; FRIDAY, APRIL 7, 2023; 2:59 P.M.

2                              --o0o--

3                    P R O C E E D I N G S

4          **COURTROOM ADMINISTRATOR:**  This is the time set for

5     the detention hearing in Case 2:23-cr-66-JAD-DJA, United

6     States of America versus Matthew Wade Beasley.

7          Counsel, please enter your appearance for the record

8     beginning with the Government.

9          **MR. SCHIESS:**  Good afternoon, Your Honor.  Daniel

10    Schiess and Eric Schmale on behalf of the United States.

11         **THE COURT:**  Okay.  Mr. Schiess and Mr. Schmale.

12    Thank you.

13         **MS. TIRINNANZI:**  Good afternoon, Your Honor.

14    Jacqueline Tirinnanzi on behalf of Defendant Matthew Beasley.

15         **THE COURT:**  Ms. Tirinnanzi.  Thank you.  And

16    Mr. Beasley.

17         Okay.  So last week Judge Youchah held the initial

18    appearance in this indictment, and it got all the way up to

19    the hearing on pretrial release.  The Government apparently

20    sought detention.  Defense asked for a five-day continuance

21    allowed under the act, so it was granted.  So we're here at

22    this point.

23         So I guess I'll just start there.  Mr. Schiess or

24    Mr. Schmale, what's the Government's position on pretrial

25    release?

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

1      **MR. SCHIESS:**  Your Honor, we're seeking detention

2   under § 3142(f)(2).

3      **THE COURT:**  (f)(2)?

4      **MR. SCHIESS:**  Yes.

5      **THE COURT:**  Serious risk of flight?

6      **MR. SCHIESS:**  Yes.

7      **THE COURT:**  Okay.

8      **MR. SCHIESS:**  And then once we establish that, then

9   we will argue -- we beat that threshold, we'll argue -- also

10  argue risk of danger to the community.

11     **THE COURT:**  I understand.  Okay.  Are you ready to

12  proceed?

13     **MR. SCHIESS:**  Yes, Your Honor.

14     **THE COURT:**  Okay.  And then, Ms. Tirinnanzi, are you

15  ready to proceed?

16     **MS. TIRINNANZI:**  Yes, Your Honor.

17     **THE COURT:**  All right.  I'll hear from the Government

18  first, please.

19     **MR. SCHIESS:**  Your Honor, may I use the lectern?

20     **THE COURT:**  Please.

21     **MR. SCHIESS:**  Thank you.

22     Thirteen months -- just about thirteen months ago

23  Mr. Beasley answered the door at his house when three FBI

24  agents approached to interview him.  He answered with a gun in

25  his hand and quickly moved it to his head.  When the FBI

1    agents ordered him to drop the gun, he moved the gun in a

2    sweeping motion towards the agents, and he was shot twice

3    to -- for the agents' self-defense.  That injury caused him to

4    go back into the house where he barricaded himself for the

5    next four hours.

6           During that next four hours, he was interviewed -- I

7    shouldn't say interviewed.  An FBI crisis -- crisis negotiator

8    spoke with him over the phone to try and get him to put down

9    the gun, to come out of the house.  During those four hour --

10   that four-hour period, Mr. Beasley made several statements,

11   some of which I'm -- will read to the Court not necessarily in

12   the order in which he made them in the four hours.

13          "I am not coming out.  I am not coming out.  When I

14   come out, I'll be dead.  I'm going to put it" -- referring to

15   the gun -- "on my forehead in a second.  I am not going to

16   prison.  I am not going to jail.  I'm thinking I need to get

17   the balls to effin pull the trigger."  And he explained why he

18   said that.  He said, quote, "I was running a Ponzi scheme.

19   I'm telling you, I'm guilty.  I'll be in jail forever because

20   of what I've done.  There's nothing for me when I come out.

21   There's nothing for me.  The humility" -- which I think he

22   meant -- meant to say, but humiliation -- "to my family.  If I

23   go to jail, they'll have nothing."

24          Your Honor, Mr. Beasley knew that the FBI was coming.

25   They'd been tipped off just earlier that morning.  He'd been

 1   tipped off by individuals who were working, associating with

 2   him in the Ponzi scheme, whose houses that morning were being

 3   searched by the FBI.  Except for Mr. Beasley, he knew that the

 4   end was coming.  He knew that his -- a Ponzi scheme always

 5   ends in collapse, and he was only surprised, as he told the

 6   negotiator, that it lasted that long.  It lasted five years.

 7        He told the negotiators that he had thought of ending

 8   his life earlier by suicide.  He said that he had written a

 9   letter to his wife and to the FBI and that it was in his

10   house.  Your Honor, it took the FBI with the SWAT team four

11   hours to get him out.  And it was the SWAT team that had to go

12   in and get him and bring him out.

13        He was taken to the hospital where he was treated,

14   and a couple days later he was released.  From the hospital,

15   he was taken into custody.  And as the Court knows from the

16   court record, that on March the 8th, 2022, he had a detention

17   hearing in front of Judge Youchah.  Arguments were made from

18   both sides, and Judge Youchah did not hesitate to detain the

19   defendant as both a risk of flight and a risk of danger to any

20   person in the community.

21        At the time he was charged by complaint with assault

22   on a federal officer, one count of assault on a federal

23   officer.  Recently, which is the reason we're here before the

24   Court, he was indicted by the grand jury on several counts of

25   wire fraud and on money laundering.

1      Soon after the indictment was handed down, we and the

2   Government, moved to dismiss the assault on the federal

3   officer charge.  Nonetheless, as we're here 13 months later,

4   the considerations that justified Judge Youchah in detaining

5   the defendant remain the same.  Or at least if they changed,

6   they have not changed to Mr. Beasley's benefit but only to his

7   detriment.

8      And so let me review some of those considerations in

9   the context of § 3142, the factors that I need to establish

10  for the Court.  And I won't necessarily take the factors in

11  the way they're listed in the statute, but I will cover them.

12     So Number 1, the nature and seriousness of the danger

13  to any person that would be posed by his release.  As I've

14  said, this is a situation where the defendant had threatened

15  suicide, had taken steps towards suicide, and in his mind saw

16  suicide as the only way out of the terrible situation that he

17  created for himself and for many, many other people.

18     Now, this was his suicide inclination and his --

19     **THE COURT:**  Ideation I think they say.

20     **MR. SCHIESS:**  -- ideation.  I just --

21     **THE COURT:**  Yeah, that's what they -- yeah, that's

22  what the --

23     **MR. SCHIESS:**  I was about to say that, and my tongue

24  got twisted.

25     **THE COURT:**  I understand.  Okay.

1      **MR. SCHIESS:** So on his suicide ideation, that wasn't

2  a one-off where he decided just to go down that road on March

3  the 4th, 2022, when the FBI came there.  He admitted that he

4  had been contemplating that for a while, that he saw that as

5  the only way out of the Ponzi scheme that he had created.

6      He knew then and he knows today that he faces a very

7  long jail sentence.  The amount of money that was involved

8  that investors invested into his scheme was just short of

9  $500 million.  In other words, as he knows, this is nearly a

10  half a billion dollar Ponzi that ran for five years that

11  involved more than a thousand individual victims and that

12  occurred while he was using his law license to be able to

13  carry out the scheme.  He recognizes the severity of what he's

14  done.  He's told the FBI that he felt humiliated, that he was

15  ashamed of what he'd been doing, and he feels like, by his own

16  statement, that he doesn't have hope, he doesn't have a life

17  given the very long sentence that he faces, plus the nature of

18  what he's done even if he comes out, the shame and the

19  humiliation of where he's been.

20      In that context, Your Honor, he presents -- because

21  those motivations, those feelings, the circumstances haven't

22  changed.  So he still presents the very serious risk of danger

23  to himself and to others.  And I remind the Court, when I'm

24  talking about others, he put law enforcement in a very

25  dangerous situation.  Although that is their job to go into

1  those situations, people don't have to do that to them.  We

2  don't have to try the agents to see if they're capable of

3  fulfilling their duty.

4       There's nothing to suggest that, if Mr. Beasley is

5  out, he doesn't fail, and the law enforcement has to go out

6  again and get him, that with his total circumstances that he's

7  not going to be [indiscernible] in the same way.

8       Now, Number 2, the nature and circumstances of the

9  offense.  As I just said, this case involves just under

10  $500 million in loss.  Just under a half a billion.  It is one

11  of the most serious Ponzi schemes that have occurred in the

12  history of this country based on the loss amount.  As I said,

13  it involves more than a thousand victims.  He committed this

14  crime while he was acting in his role as an attorney.

15       Now, he told the FBI that he got into the scheme, he

16  started it because he was severely in debt from gambling; that

17  the person to whom he was in debt was threatening him and

18  putting him in an awful situation.  But nonetheless, whatever

19  his reason for it is, his gambling addiction, his gambling

20  problems still is a factor to be considered.

21       Now, with respect to whether he has financial means

22  to be released or not, the Court probably is well aware that

23  Judge Silva, who's handling a civil case where the SEC has

24  brought civil action, a receiver has been appointed, and we

25  consolidated our efforts between the criminal side and the

```
1    civil side to let the SEC receiver try and collect all the

2    assets.

3              We spoke with the receiver.  The FBI and I and

4    Mr. Schmale spoke with them last week, and they've been able

5    to do a very thorough financial analysis as well as the FBI

6    has been able to conduct a very thorough financial analysis.

7    Based upon both parties' assessment of the nearly $500 million

8    that was taken, by the time money is accounted for, there was

9    a return to the victims, that the defendant by his own

10   admission paid off his gambling person, money that went to

11   other people in the scheme who lived a luxurious lifestyle,

12   there's still about $7- to $10 million missing, unaccounted

13   for.

14             The receiver, when we asked, do you have everything

15   for Mr. Beasley in terms of assets, he told us you don't know

16   what you don't know.  We just know that there's $7- to $10,000

17   [sic] that they can't -- or $7- to $10 million that they

18   cannot account for at this time.  So that's part of the nature

19   and circumstances of this offense that still needs to be taken

20   into account.

21             In terms of the sentence that he's facing,

22   Mr. Beasley's facing a statutory maximum of 160 years.  The

23   sentencing guidelines, when worked all the way through, put

24   him at an offense level 47, which is life.  And even if he

25   were to plead to receive acceptance of responsibility with no
```

1    other variances or downward departure, he's facing about 30

2    years in prison.  He's 50 years old, and that combination of

3    his age and the number of years in prison is what's affecting

4    him emotionally.  He knows that, if he gets out, he'll be a

5    very old man.  He knows that he will be.  As he was talking

6    with the agents and with other situations, he knows that he's

7    going to miss his four kids' lives and them growing up.  He's

8    already, since he's been in jail, missed the wedding of his

9    daughter.  He won't have any family around, and that concerns

10   him.

11          Now, why is all of that important?  It is important

12   because all of those emotional factors still drive the suicide

13   mind-set or the suicide situation that's going on.

14          Let me move now to Number 3, to the weight of the

15   evidence.  In summary, Your Honor, this is an overwhelming

16   case from an evidentiary standpoint.  There are more than a

17   thousand victims who essentially -- and many of them have been

18   interviewed -- who tell the same story about how the scheme

19   operated.  And the FBI [indiscernible] agent and talked with

20   people that were working with Mr. Beasley, all talked about

21   how the scheme worked.  And essentially Mr. Beasley had

22   promised people directly [indiscernible] to people who are

23   promoting the scheme that they could invest in litigation

24   settlement fundings.  In other words, slip-and-fall victims

25   had been hurt.  They had actually settled according to the

1  scam, the story.  The insurance litigation, they were just

2  simply waiting for the insurance companies to pay.

3      Mr. Beasley's plan and the way he conducted this for

4  five years was that he had the victims send the money to his

5  IOLTA account.  And he purportedly sent the money from his

6  IOLTA account to these nonexisting slip-and-fall clients

7  through their attorneys, except the FBI has done a very

8  thorough analysis, financial analysis.  Not a single penny

9  went from his bank account, his IOLTA account, to any

10  fictitious attorney.  Some of these attorneys were real; the

11  clients were fictitious.  And not a single penny came back in.

12  Instead, the financial analysis shows that the bank account

13  was just churning money coming in, money going out to victims

14  in terms of interest.  Money coming in, going out to the

15  people who were working with him to live an incredibly opulent

16  lifestyle.  Luxury homes.  Many, many luxury cars.

17  Mr. Beasley was even part owner on a private jet that he was

18  buying with the proceeds of the crime.  So he was living a

19  very high lifestyle.

20      So in terms of the evidence, we can clearly show that

21  it was a Ponzi.

22      But on top of all of that, but which we really don't

23  need to rely upon but we will if we need to, is that he

24  confessed.  He confessed to the agents and said that over and

25  over and over again to the crisis negotiator that he engaged

1  in a Ponzi scheme.

2         The last area is the history and characteristics of

3  the defendant.  Talked about his suicide ideation.  Now, in

4  relying upon the Pretrial Services report, it also discusses

5  his family ties.  He's now divorced.  He was divorced just a

6  few days after his barricading himself into the house.  He has

7  parents who are here.  He has children, but interesting -- and

8  I think important to consider -- is that in the revised or the

9  amended supplemented Pretrial Services report, it says nothing

10  about him having a relationship with his children, being able

11  to maintain a relationship to carry on.  He has no --

12         **THE COURT:**  You're talking about -- you're talking

13  about the report dated March 31st; right?

14         **MR. SCHIESS:**  Of this year.

15         **THE COURT:**  Yeah, this year.  Yeah.

16         **MR. SCHIESS:**  Yes, sir.

17         **THE COURT:**  And you've seen that, Ms. Tirinnanzi?

18         **MS. TIRINNANZI:**  Yes, Your Honor.

19         **THE COURT:**  Okay.  Go ahead.

20         **MR. SCHIESS:**  He has no job, no [indiscernible], no

21  law license.  It's suspended.  He says if he got out he can

22  get a job possibly in a steakhouse or construction.  And he

23  can live with his parents.

24         But, look, in terms of his characteristics, in terms

25  of his mind-set and his concerns, if he were to be released

1    and then sentenced to an awful long sentence, he would have no

2    incentive to surrender.  He doesn't believe that he has a

3    life.  He thinks it's over.  Believes that, if he goes to

4    prison with a long prison sentence, that's the end of it for

5    him, the end of the road.

6            Now, Pretrial Services, in the March 31st supplement,

7    has recommended pretrial release except there's something

8    different between the supplement of March 31st and the

9    original of March the 8th, 2022.  And the difference is this,

10   and this is based upon our discussion with Pretrial Services

11   and mine particularly with the supervising officer there.

12   What's the difference?  And their response to me was --

13   supervising [indiscernible] was recently it was brought to

14   their attention that in drafting and making recommendations

15   Pretrial Services was advised by the general counsel for

16   Pretrial Service out of Washington, D.C., not to include any

17   assessment or recommendation based upon the nature and

18   circumstances of the crime.  Well [indiscernible] what that's

19   basically doing is saying, if you're charged with a

20   white-collar crime and we're not going to look at the

21   circumstances, then all white-collar crimes are the same in

22   terms of the Pretrial Services assessment.  And there's

23   something missing on that.

24           **THE COURT:**  Well -- and I don't think that's anything

25   new.  I mean, you know, the Pretrial Services report, their

Case 2:23-cr-00066-JAD-DJA   Document 172   Filed 04/18/23   Page 15 of 41

1   main focus is on the element, history and characteristics of

2   the defendant, and they make their recommendation based on

3   that.  It's up to me to take into account -- at least that's

4   the way I do it.  I'll just explain it on the record.  Nature

5   and circumstances of the offense, weight of the evidence, was

6   he subject to release -- you know, supervision at the time of

7   the crime?

8          You know, so -- so -- so I look at history and

9   characteristics of the defendant.  That's what -- they're

10  making the recommendation on that.  They're not telling me how

11  to do my job.

12          **MR. SCHIESS:**  Okay.

13          **THE COURT:**  They're just giving me a recommendation

14  on that element.

15          **MR. SCHIESS:**  Well, I'm glad I understand that from

16  the Court.  Because when the original presentence report was

17  written a year ago, they also based it upon the nature and

18  circumstances of the underlying offense.  And that's the

19  difference between their recommendation then and their

20  recommendation now.  I just wanted to point that out to the

21  Court.

22          **THE COURT:**  All right.  Well -- and that's -- and

23  that does happen because there's always an overlap or there

24  can be between danger to the community analysis, you know,

25  danger to the community analysis and what the charged crime is

1    or the conduct in connection with the charged crime.  Even

2    though the person's presumed innocent, the fact -- that those

3    are facts that I can consider.  And so, you know, that -- that

4    does -- you know --

5              **MR. SCHIESS:**  Yes.

6              **THE COURT:**  It's a complicated process.

7              **MR. SCHIESS:**  I think we're on the same page,

8    Your Honor.

9              **THE COURT:**  All right.  Okay.

10             **MR. SCHIESS:**  We're at the same page.  I just wanted

11   to -- I'm glad to hear that from the Court.  I just wanted to

12   explain why there was a difference in the recommendation from

13   Pretrial Services between a year ago and today.  Because not

14   much has changed.

15             Look, today he's facing now that charge that he

16   didn't want to face, and that is the very long sentence

17   under -- or the wire fraud and the Ponzi scheme, which now

18   kicks in the very long sentence.  The assault on the federal

19   officer charge that he was facing, as you know, the guidelines

20   makes those high, but they're not nearly as high as what

21   happened in this case.

22             Now, even though this is a fraud case and a Ponzi

23   scheme, the conduct that occurred in his house on March the

24   4th, the suicide, all the circumstances, all of the events are

25   underlying factors for this charge.  And so I just want to

1   point that out.

2            **THE COURT:**  Well, they're not -- I don't know --

3   well, I don't know.  I don't want to get into your charging,

4   but it's common -- and, Mr. Schiess, you know, you're not over

5   here doing these that often.  Okay?  But when somebody, you

6   know, runs away, when they stop the car, and things of that --

7   I hear all that.  That's got nothing to do with the crime, but

8   what happens with the interaction with law enforcement is

9   something that's fair to be considered.  It can be argued on

10  both sides.

11           **MR. SCHIESS:**  And that's what I'm arguing.  And

12  that's --

13           **THE COURT:**  Yeah.  I got it.

14           **MR. SCHIESS:**  -- why I'm pointing it out with you.

15           **THE COURT:**  Okay.  I got it.

16           **MR. SCHIESS:**  Okay.  So, Your Honor, based upon all

17  of the circumstances I reviewed, what's also in both the

18  earlier Pretrial Services report to inform the Court and the

19  latest one, we believe there is sufficient evidence to be able

20  to meet the burden of proof we have to show that he presents

21  both a risk of nonappearance and a risk of danger to people in

22  the community.

23           **THE COURT:**  Okay.  I understand the Government's

24  position, Mr. Schiess.

25           **MR. SCHIESS:**  Thank you, Your Honor.

1      **THE COURT:**  Thank you.

2      All right.  Ms. Tirinnanzi, you can argue wherever

3   you feel most comfortable.  You can come up here if you want

4   or argue --

5      **MS. TIRINNANZI:**  Thank you, Your Honor.  I'll

6   probably just argue right here because --

7      **THE COURT:**  Yeah.  That's where usually --

8      **MS. TIRINNANZI:**  -- I have made too much of a mess.

9      **THE COURT:**  That's fine.

10     **MS. TIRINNANZI:**  So to begin, Your Honor, we're in a

11  bit of a difficult position with regard to the dropped charge

12  of the assault on a federal officer.  Our view of the events

13  that day are very different, and -- however, the case was

14  dismissed, and we never got our preliminary hearing.  We never

15  got our discovery.  So we didn't get to see everything that

16  occurred that day other than the account from my client and

17  family members that were at the home and traumatized from the

18  ordeal when, in our opinion, the FBI clearly violated

19  Mr. Beasley's Fourth Amendment rights when the agents, by

20  their own account at the initial appearance for -- you know,

21  13 months ago for that charge, you know, explained that they

22  rang the doorbell but did not wait for consent, and then

23  pushed open the front door, did not announce themselves, and

24  they did not have an arrest or search warrant.  And it -- it

25  wasn't -- there were two doors.  They came in -- they let

 1    themselves into his home.

 2            And what Mr. Beasley was doing in his home is up to

 3    him.  He was traumatized.  He's -- the agents were in plain

 4    clothes, and he didn't know at what point these individuals

 5    would be ascending upon his home.  Now, he also pled for four

 6    hours to get EMTs while, instead, there was a crisis

 7    negotiator just, you know, trying to get information.  And

 8    Mr. Beasley is desperate.  He's bleeding out in the entryway

 9    of his home.  So I don't know what he was expected to do.

10    He -- he said all kinds of things because he thought he was

11    about to die.

12            And, you know, the Government represented that he was

13    barricaded, but, you know, he was in a puddle of his own

14    blood.  He was the one that was shot that day, not the FBI.

15    So how -- how -- how is someone that's been shot able to

16    barricade themselves?  He was laying on the floor begging for

17    medical assistance for four hours.  He still has the bullet

18    holes in him -- the bullets inside of him to this day from

19    that occurrence.

20            Now, those charges were dropped.  And if you have

21    more questions, then we could get into that.  But I would like

22    to focus on some of the factors that really show that

23    Mr. Beasley is in a different place, a completely different

24    place right now after being held for 13 months when the

25    assault on the federal officer charges were dropped the same

1    day as his initial appearance for the Ponzi scheme.

2            The law requires you to consider the 3142(g) factors

3    in determining whether there are conditions of release that

4    will reasonably assure that my client won't flee and that he

5    will not be a danger to society.  We are very pleased that

6    Pretrial Services agrees with us.  For instance, we have

7    Mr. Beasley's parents here today, Wayne and Violet.  They're

8    right there.

9            **THE COURT:**  Okay.  Thank you.

10           **MS. TIRINNANZI:**  And they have agreed for Mr. Beasley

11   to come reside with them at their home in Las Vegas.

12   Mr. Beasley is tied to Las Vegas.  He's been here since 2004

13   when he moved here from the Midwest.  And he has family here.

14   He has his sons here who he hasn't been able to see because

15   he's been detained for 13 months.  His ex-wife is here.  And

16   also, a huge -- a huge development in Mr. Beasley's life --

17   and also his life outlook -- is that he is expecting the birth

18   of his grandson any day now.  And that has really reframed the

19   way that he looks at life and the ability to reconnect, you

20   know, if the children -- when the child's born, you know, with

21   his older son and the minor sons, if, you know, the wife

22   permits it, those are -- those are huge things for

23   Mr. Beasley.  He has significant ties to this community.

24           Additionally, he is needed in the home of Wayne and

25   Violet because Wayne is still employed.  And Violet lives --

*TRANSCRIBED FROM DIGITAL RECORDING*
*2:23-cr-00066-JAD-DJA • 4/7/2023*

```
 1   you know, she's a breast cancer survivor, and the -- the toll

 2   of the cancer that -- you know, she's in remission right now,

 3   but the toll of the cancer on her body was tremendous.  In

 4   addition, she has degenerative disc disease disorder, and she

 5   can barely stand for more than 30 seconds at a time.  She --

 6   she was here today by -- by using a wheelchair, but, you know,

 7   Wayne is -- you know, he's still working.  He hasn't been able

 8   to retire yet.  And having help around the home would be huge

 9   for Violet's quality of life and also giving Matt meaning and

10   duty and something to live for.

11          Additionally, we have secured a job offer which

12   Pretrial Services has confirmed with a construction company

13   here in Las Vegas.  It would be salaried and also offers the

14   chance of health insurance after 90 days of probation, which

15   is -- is massive because Mr. Beasley still -- he has -- I have

16   the records from Nevada Southern Detention Center.  He has

17   neuropathy in his arm where he was shot, and that requires

18   ongoing treatment and also eventually he would need to see a

19   specialist to have the bullets remove -- removed.  So, yes,

20   having the health insurance from that employment would also be

21   helpful to Mr. Beasley and be less of a burden on the

22   detention center.

23          In addition to the employment being verified, I have

24   a declaration from the receiver -- the receiver, Geoff

25   Winkler, as to his position on how Mr. Beasley has assisted
```

1    with -- with cooperating in the SEC case.  If you -- if you

2    would like to see it, I can show it you.

3            **THE COURT:**  Has the Government seen it?

4            **MS. TIRINNANZI:**  I have a copy for the Government as

5    well.  It's very short.

6            **THE COURT:**  Well, I don't know, Mr. Schiess?

7            **MR. SCHIESS:**  I mean, certainly I can see it.

8            **THE COURT:**  All right.  Why don't you show it to the

9    Government.

10           **MR. SCHIESS:**  She had an opportunity to give it to us

11   before the hearing.

12           **THE COURT:**  Yeah.  See if he has any objection.  I --

13   I do prefer that you, you know, don't spring things here in

14   the middle of the hearing, but take a minute.  Let him look at

15   it.

16           **MS. TIRINNANZI:**  Okay.  I mean, if you -- if

17   you're -- if it's -- if it's of interest in making your

18   determination, I believe it does have relevance due to the

19   fact that there are no funds for Mr. Beasley to flee on.

20           Now, there are other unindicted parties that, you

21   know, these funds may -- I don't know if -- if that -- if they

22   can be attributed to them.  But thus far Mr. Winkler, the

23   receiver, is pleased with Mr. Beasley's cooperation as to his

24   own assets and also those of other involved third parties.

25           **THE COURT:**  Okay.  Well, you can just make that as a

 1   proffer then.  You don't need to give it to me.  You don't

 2   need to give it to him.  Just proffering that, that's the

 3   way --

 4        **MS. TIRINNANZI:**  Okay.

 5        **THE COURT:**  -- we do things on this.  Okay.  Go.

 6        **MS. TIRINNANZI:**  Sure.  And then in addition there --

 7   there -- I believe you probably already are aware, but there

 8   is an asset freeze and a preliminary injunction.  And that's

 9   been in place in the SEC case since April of 2022.  So we

10   don't know how else Mr. Beasley would have access to funds to

11   flee if there's -- you know, there's been that action taken

12   almost a year ago, and the receiver is again saying how

13   pleased he is with Mr. Beasley's cooperation.

14        And the -- the declaration also explains that

15   Mr. Beasley is -- is planning to meet with Mr. Winkler later

16   this month to follow up on other issues.  Being detained has

17   inhibited his ability to potentially make sure that, you know,

18   everything is -- has been turned over, but he has done -- and

19   as the declaration says -- he has done that to the best of his

20   ability given -- given his circumstances.

21        **THE COURT:**  Okay.

22        **MS. TIRINNANZI:**  Additionally, this was also already

23   filed so everyone -- the Government is already familiar with

24   it.  But there was a report produced in the assault on a

25   federal officer case stating by Joseph McEllistrem that

1     Mr. Beasley is not at suicide risk, and --

2          **THE COURT:**  Do you have -- do you have a docket

3     number for that?

4          **MS. TIRINNANZI:**  Sure.  It's Docket Number 12-1.

5          **THE COURT:**  Hold on there.  So 12 is the motion to

6     reopen detention hearing.

7          **MS. TIRINNANZI:**  And one -- it was attached as an

8     exhibit.

9          **THE COURT:**  Got it.  I'm pulling it up.  I hadn't

10    seen -- you know, I didn't go back over the other case.  Okay.

11         So you're saying that this -- you've seen this

12    before, Mr. Schiess?

13         **MR. SCHIESS:**  Yes, Your Honor.

14         **THE COURT:**  Okay.

15         **MS. TIRINNANZI:**  So Mr. Beasley was not put on any

16    suicide precautions at the facility, and 13 months later he is

17    still alive.  And the doctor who... excuse me.

18         **THE COURT:**  I'm trying to -- this is a long report.

19         **MS. TIRINNANZI:**  He's a forensic director of health

20    services for Carson City and Douglas County Sheriff's

21    Department and addresses suicide risk routinely for

22    facilities, justice and municipal courts, and the district

23    courts, and has established suicide prevention procedures in

24    both jail facilities.  And he made the finding that

25    Mr. Beasley is absolutely not at risk for suicide.

1    **THE COURT:**  Well, it says -- the last paragraph says,

2  in summary, based on his history and current psychological

3  presentation -- when was this done?

4    **MS. TIRINNANZI:**  The date on the evaluation is -- was

5  March 24th, 2022.

6    **THE COURT:**  So that was a year ago.

7    **MS. TIRINNANZI:**  And the date of report was April

8  2nd, 2022.  That was following the ordeal when the FBI let

9  themselves into Mr. Beasley's home.

10    **THE COURT:**  There's no eminent risk of suicide,

11  that's your point.

12    **MS. TIRINNANZI:**  Yes, that's correct.

13    **THE COURT:**  I got it.  Okay.

14    **MS. TIRINNANZI:**  Do you have any questions at this

15  time, Your Honor?

16    **THE COURT:**  Oh, no.  No.  That's fine.  I think I

17  understand your position.

18    Let me hear from the Government.

19    **MS. TIRINNANZI:**  Okay.  Thank you.

20    **THE COURT:**  Rebuttal?

21    **MR. SCHIESS:**  Certainly.

22    Your Honor, with respect to the doctor suicide

23  report, that was presented to Judge Youchah, and she denied

24  his motion to be released, motion to reconsider.  And I

25  pointed out in the Government's response, which was ECF 16,

1    that the doctor's assessment did not include all the

2    considerations that he said based on his own studies can have

3    a negative impact on a person such as death in the family or

4    divorce.  The defendant's wife divorced him within days after

5    the standoff, and the doctor had access to that information,

6    didn't include it, and other factors, and the -- Judge Youchah

7    wasn't persuaded by it.  And I don't -- the Court shouldn't

8    either.

9           Now, Ms. Tirinnanzi tells the Court that in the

10   beginning the FBI possibly violated the Fourth Amendment

11   rights by pushing through an open door.  That is not true.

12   And I will tell you that she has sufficient -- or she has

13   information, access to it at least.  What happened is

14   Mr. Beasley has a luxury house.  He has an outer gate, one of

15   those half fences, half gates.  They went through that, and

16   then went to knock on the door.  Okay?  This was not pushing

17   in a door.

18          Mr. Beasley was the only person home at the time.

19   His wife wasn't there.  His kids weren't there.  Everybody was

20   gone.

21          She raises the inference and said that he didn't know

22   it was the FBI coming.  Well, let me tell you this.  About two

23   weeks ago Ms. Tirinnanzi asked to come to my office before the

24   scheduled preliminary hearing for the FO charge.  I met with

25   her and with her assistant, Michael Harrison, who is a

1    mitigation specialist, and Mr. Schmale.  At that time I told

2    her that we would not be going forward on the FO charge.  But

3    nonetheless, I gave her a copy of the transcript of the crisis

4    negotiator conversation that lasted over the four hours.

5            Isn't that correct, that I gave that to you?

6            **THE COURT:**  You don't have to --

7            **MR. SCHIESS:**  Okay.  Now, in that --

8            **THE COURT:**  Hold on, Mr. Schiess.

9            **MR. SCHIESS:**  Yes, sir.

10           **THE COURT:**  You do not ask another counsel a question

11   on the record in front of me.

12           **MR. SCHIESS:**  Yes, sir.

13           **THE COURT:**  Go sit down.

14           **MR. SCHIESS:**  I apologize for that.

15           **THE COURT:**  Sit down.

16           **MR. SCHIESS:**  May I continue from here?

17           **THE COURT:**  No.  Just be quiet for a minute.

18           **MR. SCHIESS:**  Okay.

19           **THE COURT:**  I get your point that you -- you had a

20   meeting with her.  Why -- why are you bringing this meeting

21   up?

22           **MR. SCHIESS:**  Because she represented to the Court

23   that he was begging for medical assistance in the house, and I

24   gave her the transcript then.  The transcript shows that he

25   was doing the exact opposite.  The negotiator was trying to

1    get him medical assistance.  He was not [indiscernible] it.

2            **THE COURT:**  Oh --

3            **MR. SCHIESS:**  He admitted that he knew --

4            **THE COURT:**  I -- you don't -- you don't need to go

5    there.  I -- you know, I'm trying to make a very important

6    decision that affects this man's life, and I don't want this

7    thing to degenerate into two lawyers arguing with each other

8    and trying to flex their muscles here in front of me and think

9    that's going to... if you can't control yourself, Mr. Schiess,

10   you can leave, and Mr. Schmale can finish this up.  Is that

11   what you want to do?

12           **MR. SCHIESS:**  No, Your Honor.

13           **THE COURT:**  Okay.  Then you just sit there and be

14   quiet and don't speak again unless you stand up, and don't

15   stand up until I tell you you can.

16           I'm trying to decide a very important question here

17   for this gentleman who's presumed innocent about whether he's

18   going to stay in custody or be released pending his -- his

19   trial.  The Bail Reform Act puts a heavy burden on me to

20   release if I can find a way, and the test isn't is he a risk

21   of flight or a danger to the community.  He clearly is.  The

22   test is whether I can fashion conditions so it's safe to let

23   him go, as safe as I can be.  I can't predict the future.  And

24   that we can assure he'll show up.

25           And so when I try to figure that out -- and I'll

```
 1   explain why I'm doing it, whatever I decide -- I haven't
 2   decided yet.  But I do not want this to turn into some contest
 3   where you're impeaching the other counsel.  If you want to say
 4   you proffer that what she says is not there, fine.  And move
 5   on.
 6           Okay.  You can come back up to the podium.
 7           MR. SCHIESS:  My apologies for my approach and my
 8   behavior.  I apologize, Your Honor.
 9           THE COURT:  Okay.  Go ahead.
10           MR. SCHIESS:  I -- I was -- I'm simply trying to make
11   a record that to the extent the Court may rely upon a
12   representation about Mr. Beasley's state of mind on March the
13   4th when the FBI came there, the transcript says something
14   different about his state of mind, and that was -- been
15   provided and accessible.
16           THE COURT:  Okay.  So you've reviewed the transcript.
17   You're telling me that, you know, what was represented by
18   counsel is not consistent with the transcript, and you believe
19   what you told me at the beginning was a more accurate
20   representation of his state of mind at the time?
21           MR. SCHIESS:  Yes.
22           THE COURT:  I got it.
23           MR. SCHIESS:  And --
24           THE COURT:  What's the next point?
25           MR. SCHIESS:  Next time I will be far more careful
```

1  with my emotions and responding to something of that nature.

2  I apologize.  And I apologize to Ms. Tirinnanzi for addressing

3  her in that fashion.

4         **THE COURT:**  All right.  That's fine.

5         **MR. SCHIESS:**  In terms of then our -- the totality of

6  all the circumstances, the concern that we have is the factors

7  that drove his state of mind and the circumstances that drove

8  his state of mind in March of 2022 are still existing today.

9  Nothing has really changed to drive -- to affect those factors

10  and circumstances.

11         **THE COURT:**  Okay.  I understand --

12         **MR. SCHIESS:**  Thank you.

13         **THE COURT:**  -- your position.  Thank you.  Now --

14         **MS. TIRINNANZI:**  Your Honor, if I may?

15         **THE COURT:**  Very briefly.  You know, the --

16         **MS. TIRINNANZI:**  Very briefly.  I'm sorry to waste

17  everyone else's time.

18         **THE COURT:**  No, no --

19         **MS. TIRINNANZI:**  And mister --

20         **THE COURT:**  Let -- wait.  Hold on.  Hold on just a

21  second.  Okay.

22         The Government has the burden.  I let them go first.

23  You get a chance to respond.  They get the last word because

24  they have the burden of showing me by a preponderance of the

25  evidence that no condition or combination of conditions

1    reasonably assure your client's appearance, and by clear and

2    convincing evidence that similarly will protect other persons

3    of the community.  So if you bring things up, I'm going to

4    hear from Mr. Schiess on it.  And I'm -- and this is going to

5    be the very last time because that was your chance before.

6          But go ahead.  What do you have that you think I

7    didn't get?

8          **MS. TIRINNANZI:**  I just wanted to add that

9    Mr. Beasley has never owned a passport, and he's never left

10   the country.  He's almost afraid to leave the country after a

11   Dateline special he saw about 20 years about something that

12   happened to someone traumatic when they were traveling.  So he

13   is very rooted here, and he has no -- he's never had a

14   passport and never obtained one.

15         And then, additionally, I'm sure Your Honor is

16   already aware, but I do have a list of other white-collar

17   offenders in amounts similar to Mr. Beasley's and also much

18   greater that have been granted pretrial release if you would

19   like to hear them?

20         **THE COURT:**  No, I would not.

21         **MS. TIRINNANZI:**  But I think that you probably

22   already are aware.

23         **THE COURT:**  Well, not only that, but this decision on

24   release -- you can't say categorically, because all these

25   people are handled one way, this defendant should be handled a

```
1    different way.  These are very fact-intensive decisions --
2            MS. TIRINNANZI:  Oh --
3            THE COURT:  -- and they're --
4            MS. TIRINNANZI:  -- certainly.
5            THE COURT:  -- monument -- you know, what -- what
6    happened to somebody else is of no relevance to my considering
7    this.
8            MS. TIRINNANZI:  Certainly.  I agree.  Just -- sure.
9    Yes, Your Honor.
10           THE COURT:  Okay.  Thank you.
11           MS. TIRINNANZI:  Thank you.
12           THE COURT:  Do you have anything more to add,
13   mister --
14           MR. SCHIESS:  No, Your Honor.
15           THE COURT:  Oh.  Okay.  So, you know, the -- the four
16   factors I'm supposed to consider, Number 1 is the nature and
17   circumstance of the offense.  Now, this is a very serious
18   offense.  Five counts of wire fraud, three counts of money
19   laundering, which, you know, the Government has tailored and
20   put their case in a way that can proceed under the law.  The
21   evidence about, you know, the amounts of money, the people
22   involved, it's a very, very serious case.  The weight of the
23   evidence is apparently very strong.  That weighs in favor of
24   detention, but it's the least important factor for the Court
25   to consider under Ninth Circuit precedent, again, because of
```

1    presumption of innocence.

2            At the time of the offense, the defendant was not

3    subject to conditions of release.  Clearly he's never had any

4    other criminal enter -- interaction with the criminal justice

5    system.  Nothing in his record.

6            So now we look at the history and characteristics of

7    the defendant.  Strong personal ties to the community.  He has

8    a place to live.  His law license has been suspended, but, you

9    know, he and his family made plans for him to have -- have

10   employment and try to be able to live a life while this case

11   is pending.  That's something that's encouraged by the Bail

12   Reform Act.  No criminal history.

13           But then we get to the armed confrontation with the

14   federal agents, and, you know, to me, why I'm trying to

15   wrestle with this a little bit, this reminds me -- and I hope

16   the -- you know, nobody here takes it the wrong way, but, you

17   know, in Federal Court we have to deal with these child

18   pornography cases that come along, and a lot of the times the

19   defendant is a -- usually male -- almost always, I guess --

20   who's had a full career in the family, he's a pillar to the

21   community, he's never had any interaction with law

22   enforcement, and things of that nature.  And now all of the

23   sudden he's facing years in prison, a serious, humiliating

24   charge, and things like that.  We have had defendants in my

25   time here commit suicide that are defendants in child

```
 1   pornography cases.

 2              Interestingly, the statute doesn't talk about danger

 3   to himself.  It's danger to other persons who are in the

 4   community.  I've wrestled with that.  You do worry if someone,

 5   you know, just loses -- loses it because of what they're

 6   facing and they try to take their life.  They could hurt other

 7   people, you know.  It's something I really worry about.

 8              So -- so -- but this is a unique case here because

 9   this defendant was charged with a different crime, and he's

10   been in custody for a year.  And, you know, so I'm really

11   wrestling with the time that he spent in custody.  He's now

12   aware of where his life is.  Has he seen now that the -- the

13   way to go for himself, for his family, is to accept it, deal

14   with what the system has to hand out to him, and try to make

15   the best he can?  Is he in a -- in a frame of mind that's

16   different from when the whole house of cards was coming down

17   on him and the agents were in front of his house and -- and,

18   you know, obviously he -- he lost it?

19              And so, you know, the Government argues persuasively

20   nothing's really changed.  He's a very -- risk of doing

21   something out of line and to hurt other people in the

22   community or, you know, fleeing, I think that's hard to

23   imagine he would, but if he tried to, most people don't have

24   much luck doing that in my experience.  I can't imagine you

25   would.
```

```
1            So, you know, I -- I just don't know.  I'm having a
2    very hard time with this, but I -- I think I have to go and --
3    and give Mr. Beasley a chance to show that he can fit into the
4    system.
5            I've got to tell you, sir, you're going to be under
6    supervision.  You have to work with these Pretrial Services
7    officers.  You know, you're used to -- a lawyer, used to
8    making decisions.  Don't make decisions.  If you have a
9    question in your mind is this going to be in compliance or is
10   this going to be a problem, check with your lawyer, check with
11   the Pretrial Services officers.  And you have to stick to
12   these.
13           Okay.  So based on all those, I do conclude that
14   conditions can be fashioned to protect other persons of the
15   community and also to ensure his appearance.  And I'm
16   particularly persuaded because with the support from the
17   family and, you know, maybe I will address this other thing.
18   You know, I -- I know your mom needs help or whatever.  That's
19   usually not something that persuades me.  You know, I mean,
20   I'm -- I like people to have help when they need it, but the
21   point is I -- that might be another factor for you to get with
22   the program and help your mom stay with your family, work, and
23   work your way through this.  I mean, life will go on once this
24   is over.  All right?
25           So I'm going to order him be released, a personal
```

1    recognizance bond.  Sorry.

2            Defendant shall report to Pretrial Services for

3    supervision, abide by the following restrictions on personal

4    association, place of abode, and travel.  Travel is restricted

5    to Clark County, Nevada.  The defendant shall maintain his

6    residence at 2213 Paseo Court, Las Vegas, Nevada, 89117 and

7    may not move prior to obtaining permission from the Court,

8    Pretrial Services, or supervising officer.

9            Maintain and actively seek lawful, verifiable

10   employment.  Notify Pretrial Services or supervising officer

11   of any change.

12           Avoid any contact directly or indirectly with any

13   person who is or may become a victim or potential witness in

14   the investigation, including but not limited to -- and the

15   Government will need to provide a list of who he cannot

16   contact.

17           Refrain from possessing a firearm, destructive

18   device, other dangerous weapon.

19           Submit to mental health evaluation as directed by

20   Pretrial Services or supervising officer.  Participate in

21   mental health treatment as directed.  Pay for the cost of the

22   medical or psychiatric treatment based on ability to pay.

23           Wait.  Does that say medical or psychiatric?  That

24   should be mental health or psychiatric treatment; right?  I

25   mean, we don't offer him medical treatment as part of release.

1    **PRETRIAL SERVICES OFFICER:**  No, Your Honor, but that

2    is the way that the condition is written on the bond, as

3    medical or psychiatric treatment.

4    **THE COURT:**  Okay.  Ability to pay.  And then

5    defendant shall not solicit monies from investors and not --

6    and shall disclose financial information as directed by

7    Pretrial Services or supervising officer.

8    That's pretty important.  Work with your lawyer on

9    that, and you -- it's been represented you're going to be

10   cooperating with the receiver.  You know what?  Would you -- I

11   think maybe we put a condition in there that he cooperate with

12   the receiver in -- in -- in collecting the various information

13   so the property can be returned.  So let's add that as --

14   cooperating with the receiver in the related civil action.

15   Okay.  Anything else to come before the Court?

16   **MR. SCHIESS:**  Yes, Your Honor.  Your Honor, may we

17   impose upon the Court to stay this for a few minutes?  We want

18   to consult with our office to see if they feel it would be

19   appropriate if we would come back and ask the Court for a stay

20   pending appeal.

21   **THE COURT:**  Okay.  Pending going up to --

22   **MR. SCHIESS:**  We just need a few minutes, please.

23   **THE COURT:**  -- Judge Dorsey.  Yeah, I -- I don't know

24   if you know, Judge Navarro just entered an order in another

25   case about -- about that I guess.

1     **MR. SCHIESS:**  I'm not familiar with it.

2     **THE COURT:**  Yeah.  It was interesting.  I -- I just

3  read it.  Because the public defender was arguing that there's

4  nothing in the Bail Reform Act that allows the magistrate

5  judge to stay his decision, and they were trying to get

6  release while, you know, it was being battled out.  It's...

7  gosh, I can't remember who the defendant is.

8     But anyway, no, I -- I think that's -- what I'm going

9  to do is we can hold the defendant here.  Can you hold him up

10 here?  And I've got to go ahead, I got a lot -- I've got five

11 more people to do.  Why don't you come back once we're done?

12    **MR. SCHIESS:**  Thank you very much.

13    **THE COURT:**  You can let me know, ask for a stay or

14 not.

15    **MR. SCHIESS:**  Thank you.

16    **THE COURT:**  Okay.  All right.  Do you have any

17 objection to that, Ms. Tirinnanzi?

18    **MS. TIRINNANZI:**  No, Your Honor.

19    **THE COURT:**  Okay.  Good.  Let's do that.

20    **MS. TIRINNANZI:**  Thank you, Your Honor.

21    **COURTROOM ADMINISTRATOR:**  All rise.

22    *(Pause, 3:48 p.m., until 4:21 p.m.)*

23    **COURTROOM ADMINISTRATOR:**  We're now recalling United

24 States of America versus Matthew Wade Beasley, Case Number

25 2:23-cr-66-JAD-DJA.

1      Please enter your appearance for the record beginning

2   with the Government.

3           **MR. SCHIESS:**  Daniel Schiess for the United States.

4           **THE COURT:**  Thank you, Mr. Schiess.

5           **MS. TIRINNANZI:**  Jacqueline Tirinnanzi for Matt

6   Beasley.

7           **THE COURT:**  Thank you, Ms. Tirinnanzi.

8           The record will reflect that Mr. Beasley's here.

9           Okay.  What -- what have you decided, Mr. Schiess?

10          **MR. SCHIESS:**  Your Honor, the Government would like

11  to go forward with asking the Court to stay its order pending

12  appeal.  What we would like to do -- given now it's late

13  Friday night, we would like to have the Court stay until

14  Monday at 5:00.  That would give us time over the Easter

15  weekend to be able to prepare the written motion to appeal

16  before the judge.

17          **THE COURT:**  All right.  Let's see.  On -- on the

18  marshals, if we keep it open till 5:00, then he couldn't be

19  released till Tuesday morning then; is that right?  If you get

20  notice at 5:00, that would be too late to release him?

21          **THE MARSHAL:**  That sounds [indiscernible] but I can

22  check with my supervisor right now, Your Honor.

23          **THE COURT:**  How -- why don't we make it 3:00?

24          **MR. SCHIESS:**  Okay.

25          **THE COURT:**  So that way -- I'm sure if we can notify

1  the -- by 3:00, then you can release him tomorrow -- Monday,

2  and that will give you enough time.  So -- but I'll hear from

3  Ms. Tirinnanzi of course before I --

4      **MS. TIRINNANZI:**  Thank you, Your Honor.

5      I mean, we oppose the request, and we stand by your

6  decision that there are conditions that can be fashioned and

7  that he will be able to follow the conditions.  So we stand by

8  that decision, and also in light of the fact that it's Easter

9  weekend, it would be fantastic for this defendant to be able

10  to spend it with his parents.  And also given the fact that

11  he's been detained the past 13 months, we're -- we're very

12  eager for him to be released.

13      **THE COURT:**  Okay.

14      **MS. TIRINNANZI:**  So we -- we oppose the Government's

15  request.  Thank you.

16      **THE COURT:**  I understand.  You know, I -- I -- I

17  sympathize with all that, but I think, you know, the orderly

18  process here -- this was -- it's a close call.  I think I

19  explained my decision on this on the record, but the

20  Government does have a right to go up on it.  And rather than,

21  you know -- I mean, as a practical matter, they can be calling

22  Judge Dorsey at home or something if they want.  There's just

23  no need to do that.  I think it's fair to give them until

24  3:00 o'clock on Monday to get that in.

25      Now, if they -- if you decide not to do it, you know,

 1    please -- please let Tirinnanzi -- Ms. Tirinnanzi knows so

 2    that then she -- you can contact the marshals and let him get

 3    going on Monday.  Okay?

 4             **MR. SCHIESS:**  Yes, Your Honor.

 5             **THE COURT:**  Okay.  But if you get it filed by -- by

 6    3:00 o'clock, then you'll have to stay temporarily --

 7    detention will continue until Judge Dorsey can review my

 8    decision.

 9             **MS. TIRINNANZI:**  Thank you, Your Honor.

10             **THE COURT:**  Thank you.

11        *(Proceedings adjourned at 4:24 p.m.)*

12                           * * *

13        I, AMBER M. McCLANE, court-appointed transcriber, certify

14    that the foregoing is a correct transcript transcribed from

15    the official electronic sound recording of the proceedings in

16    the above-entitled matter.

17

18    /s/_____*Amber M. McClane*_____    4/18/2023
          AMBER MCCLANE, RPR, CRR, CCR #914        Date

19

20

21

22

23

24

25